Jean S. Martin (admitted *pro hac vice*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
*jeanmartin@forthepeople.com*

Bryan L. Bleichner (admitted *pro hac vice*)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dillan Clarke, Elayne Martinez, Brittney Johnson, Brian Kircher, Juanita Sarabia, Megan Kircher, Donald Banti and Marcia Banti, Ryan Mangum and Tiffany Mangum, Anthony Spano, Carol Ashby, Margaret O'Grady, Mayra Esquival and her minor son, E. N., on behalf of themselves and all others similarly situated, | Case No. 2:22cv-01061-PHX-SMB |
| Plaintiffs, | **PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| Yuma Regional Medical Center, | |
| Defendant. | |

1

Plaintiffs Dillan Clarke, Elayne Martinez, Brittney Johnson, Brian Kircher, Juanita Sarabia, Megan Kircher, Donald Banti and Marcia Banti, Ryan Mangum and Tiffany Mangum, Anthony Spano, Carol Ashby, Margaret O'Grady, Mayra Esquival and her minor son, E. N. ("Plaintiffs") bring this Consolidated Class Action Complaint on behalf of themselves, and all others similarly situated against Defendant Yuma Regional Medical Center ("Yuma Regional" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities, and alleges as follows:

## NATURE OF THE ACTION

1.      On April 25, 2022, Defendant Yuma Regional Medical Center, a 406-bed, not-for-profit hospital established in 1964, identified a ransomware attack of its internal systems. Cybercriminals had unrestricted access to Yuma Regional's files and systems from April 21, 2022 to April 25, 2022 (the "Data Breach").

2.      As a result, Yuma Regional lost control of highly-sensitive files belonging to 700,000 patients that contained personal health information ("PHI" or "Private Information")[1], including names, Social Security numbers, health insurance information,

---

[1] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a health care provider who transmits any health information in electronic form in connection with a transaction covered by HIPAA. *Id. Covered entity*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, Dep't of Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited Feb. 12, 2024). Yuma

2

and medical information relating to care received at Yuma Regional.

3.      Not only did Yuma Regional fail to properly protect its patients' PHI, Yuma Regional failed to timely notify its patients of the Data Breach, waiting over two months to send letters to impacted patients.

4.      When Yuma Regional finally announced the Data Breach, it deliberately underplayed the Breach's severity and obfuscated the nature of the Breach. Yuma Regional's Breach Notice sent to patients fails to explain how many people were impacted, how the breach happened, or why it took over two months to send a bare-bones notice to impacted patients.

5.      On information and belief, cybercriminals were able to breach Yuma Regional's systems because Yuma Regional did not maintain reasonable security safeguards or protocols to protect its patients' PHI, leaving it an unguarded target for theft and misuse. In fact, Yuma Regional confirms as much in its Breach Notice: "To help prevent something like this from happening again, we strengthened the security of our systems and will continue enhancing our protocols to safeguard the information in our care."

6.      Yuma Regional's failure to timely detect and notify breach victims violates Arizona law and has made its patients vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PHI.

7.      Yuma Regional offered "free credit monitoring and identity theft protection services" for an unstated duration. This is insufficient protection for those impacted by the Data Breach as their PHI was taken by unknown cybercriminals and can be used at any

_____

Regional is plainly a "covered entity" and the data compromised in the Data Breach that this action arises out of is "protected health information" subject to HIPAA.

time in the future. Yuma Regional's offering will not prevent the unauthorized use of its patients' PHI and will merely serve to (possibly and hopefully) notify them if and when their PHI is used.

8.     Yuma Regional knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PHI misuse.

9.     Yuma Regional's misconduct has injured the Plaintiffs and members of the proposed Class, including: (i) the lost or diminished value of their PHI; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive PHI.

10.     Plaintiffs and members of the proposed Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their PHI. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

11.     Plaintiffs and members of the proposed Class therefore bring this lawsuit seeking damages and relief for Defendant's actions.

## PARTIES

12.     Plaintiff Dillan Clarke is a resident and citizen of Arizona, residing in Yuma. Plaintiff Clarke received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network. The compromised files contained Plaintiff Clarke's Private Information.

13.     Plaintiff Elayne Martinez is a resident and citizen of Arizona, residing in Yuma. Plaintiff Martinez received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network. The compromised files contained Plaintiff Martinez's Private Information.

14.     Plaintiff Brittney Johnson is a natural person and citizen of Arizona, residing in Yuma, Arizona. Plaintiff Johnson received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network.   The compromised files contained Plaintiff Johnson's Private Information.

15.     Plaintiff Brian Kircher is a resident and citizen of Arizona, residing in Phoenix.  Plaintiff Kircher received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network. The compromised files contained Plaintiff Kircher's Private Information.

16.     Plaintiff Juanita Sarabia is a natural person and citizen of Arizona, residing in Yuma, Arizona. Plaintiff Sarabia received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network.   The compromised files contained Plaintiff Sarabia's Private Information.

17.     Plaintiff Megan Kircher is a natural person and citizen of Arizona, residing in Yuma, Arizona. Plaintiff M. Kircher received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network.  The compromised files contained Plaintiff M. Kircher's Private Information.

18.    Plaintiffs Donald and Marcia Banti ("Banti Plaintiffs") are residents and citizens of Arizona, residing in Yuma, Arizona. The Mangum Plaintiffs received notice that unauthorized actors gained access to files on Yuma's network.  The compromised files contained the Banti Plaintiffs' Private Information.

19.    Plaintiffs Ryan and Tiffany Mangum ("Mangum Plaintiffs") are residents and citizens of Arizona, residing in Yuma, Arizona. The Mangum Plaintiffs received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network.  The compromised files contained the Mangum Plaintiffs' Private Information.

20.    Plaintiff Anthony Spano is a natural person and citizen of Arizona, residing in Yuma, Arizona. Plaintiff Spano received a letter dated June 9, 2022, from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network.  The compromised files contained Plaintiff Spano's Private Information.

21.    Plaintiff Carol Ashby is a natural person and citizen of Arizona, residing in Yuma, Arizona. Plaintiff Ashby received a letter from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network.  The compromised files contained Plaintiff Ashby's Private Information.

22.    Plaintiff Margaret O'Grady is a natural person and citizen of Arizona, residing in Yuma, Arizona. Plaintiff O'Grady received a letter from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on Yuma's network.  The compromised files contained Plaintiff O'Grady's Private Information.

23.    Plaintiff Mayra Esquival and her minor son, E.N., are residents and citizens of Arizona, residing in Yuma, Arizona. Plaintiff Esquival received a letter from Defendant Yuma Regional Medical Center stating that unauthorized actors gained access to files on

Yuma's network. The compromised files contained Plaintiffs Mayra Esquival's and E.N.'s Private Information.

24.    Defendant Yuma Regional is an Arizona corporation with its principal place of business at 2400 South Avenue A, Yuma, Arizona, in Yuma County, 85364.

## JURISDICTION AND VENUE

25.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

26.    This Court has personal jurisdiction over Yuma Regional because Defendant is headquartered in Arizona and conducts substantial business in this District.

27.    Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant is headquartered in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Yuma Regional's Failure to Safeguard Patients' PHI

28.    Plaintiffs and members of the proposed Class are Yuma Regional's current and former patients.

29.    As a prerequisite of receiving treatment, Yuma Regional requires its patients to provide their PHI.

30.    On information and belief, Yuma Regional maintains records of its patients' information, such as its patients' full names, Social Security Numbers, financial account information, credit-card information, dates of birth, prescription information, diagnosis

information, treatment information, treatment providers, health insurance information, medical information, and Medicare/Medicaid ID numbers, in the ordinary course of business. These records are stored on Yuma Regional's computer systems.

31. When Yuma Regional collects this sensitive information, it promises to use reasonable measures to safeguard the PHI from theft and misuse.

32. In fact, Yuma Regional informs its patients that it collects, maintains, and safeguards their PHI (the "Privacy Policy).

33. The Privacy Policy warrants that Yuma Regional is "committed to protecting the confidentiality of [its patients'] medical information" and acknowledges its legal requirements to protect and responsibly disclose PHI in certain enumerated situations to authorized individuals. Yuma Regional also admits its duty to notify its patients in the event that it discovers a breach of unsecured PHI.

34. Yuma Regional also grants its patients the right to "expect that treatment records are confidential unless you have given permission to release information or reporting is required or permitted by law."

35. Yuma Regional represented to its patients that their PHI would be secure. Plaintiffs and members of the proposed Class relied on such representations when they agreed to provide their PHI to Yuma Regional.

36. Despite its alleged commitments to securing sensitive patient data, Yuma Regional does not follow industry standard practices in securing patients' PHI.

37. In April 2022, hackers bypassed Yuma Regional's security safeguards and infiltrated its systems, giving them unfettered access to patients' PHI.

38. The unauthorized individuals had access to patients' PHI from April 21, 2022, to April 25, 2022, and removed files from Yuma Regional's systems. Exh. A.

39.    In response to the Data Breach, Yuma Regional contends that it "strengthened the security of [its] systems and will continue enhancing [its] protocols to safeguard the information in [its] care." Exh. A. These additional security measures should have been in place *before* the Data Breach.

40.    Yuma Regional's Breach Notice letter, as well as its website notice, both omit the size and scope of the breach. Yuma Regional has demonstrated a pattern of providing inadequate notices and disclosures about the Data Breach.

41.    On information and belief, the Data Breach has impacted at least 700,000 former and current Yuma Regional patients.

42.    On information and belief, Yuma Regional does not adequately train its employees on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems.

43.    Yuma Regional's negligent conduct caused the Data Breach. Yuma Regional violated its obligation to implement best practices and comply with industry standards concerning computer system security. Yuma Regional failed to comply with security standards and allowed its patients' PHI to be accessed and stolen by failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach.

44.    On information and belief, Yuma Regional notified victims of the Data Breach that their PHI was accessed in the breach via Notice Letters.

45.    Though Yuma Regional offered free credit monitoring and identity theft protection services, breach victims do not know for how long these services will be provided.

46.    This is significant because, once PHI is taken by unauthorized individuals, victims' PHI can end up anywhere, be bought by anyone, and be used at any time in the

future.

47.    Despite the lifelong harm that the Data Breach poses to Yuma Regionals former and current patients, Yuma Regionals offering of these monitoring services do not adequately address the harm its patients have suffered and will continue to suffer for many years to come.

**B.    Plaintiffs' Experiences**

**i.    Plaintiff Clarke**

48.    Plaintiff Clarke was a medical patient of doctors who are part of the Yuma Regional's medical network.

49.    As a condition of receiving medical services, Plaintiff Clarke provided her Private Information to Yuma Regional with the expectation that her Private Information would remain confidential.

50.    Plaintiff Clarke entrusted that her Private Information would be safeguarded according to internal policies and state and federal law.

51.    Upon information and belief, Plaintiff Clarke's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

52.    On approximately June 9, 2022, Defendant notified Plaintiff Clarke that Defendant's network had been accessed by unauthorized third parties and that Plaintiff Clarke's Private Information may have been involved in the Data Breach.

53.    Plaintiff Clarke is very careful about sharing her sensitive Private Information. Plaintiff Clarke has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Clarke stores any documents containing her Private Information in a safe and secure location or destroys

the documents.

54.    As a result of the Data Breach, Plaintiff Clarke has spent time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the notice of the Data Breach, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

55.    Plaintiff Clarke suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Clarke entrusted to Defendant, which was compromised in and as a result of the Data Breach.

56.    Plaintiff Clarke also experienced actual injury in the form of identity theft. After the Data Breach, Plaintiff Clarke had her personal debit card compromised and she was unable to use it. Plaintiff's banking institution contacted Plaintiff asking her if she was accessing her account through an unrecognizable device.

57.    Plaintiff Clarke has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

58.    Upon information and belief, Plaintiff Clarke has experienced a significant increase in the receipt of spam e-mail messages, phone calls, and text messages because of the Data Breach.

59.    Plaintiff Clake has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private

Information.

60.     Plaintiff Clarke has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### ii.  Plaintiff Martinez.

61.     Plaintiff Martinez is a medical patient of Yuma Regional.

62.     As a condition of receiving medical services, Plaintiff Martinez provided her Private Information to Yuma Regional with the expectation that her Private Information would remain confidential.

63.     Plaintiff Martinez entrusted that her Private Information would be safeguarded according to internal policies and state and federal law.

64.     Upon information and belief, Plaintiff Martinez's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

65.     On approximately June 9, 2022, Defendant notified Plaintiff Martinez that Defendant's network had been accessed by unauthorized third parties and that Plaintiff Martinez's Private Information may have been involved in the Data Breach.

66.     Plaintiff Martinez is very careful about sharing her sensitive Private Information. Plaintiff Martinez has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Martinez stores any documents containing her Private Information in a safe and secure location or destroys the documents.

67.     As a result of the Data Breach, Plaintiff Martinez has spent time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of

the notice of the Data Breach, exploring credit monitoring and identity theft protection services, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Indeed, in the notice letter Plaintiff received, Yuma Regional directed Plaintiff to spend time mitigating her losses.

68.    During the duration of the data breach and subsequent network outage, Plaintiff Martinez was unable to access her medical test results, or to schedule further appointments with her physicians via Defendant's online systems.

69.    Plaintiff Martinez suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Martinez entrusted to Defendant, which was compromised in and as a result of the Data Breach.

70.    Since the Data Breach, Plaintiff Martinez has also received an increase in spam e-mails, text messages, and phone calls regarding medically related matters. Plaintiff Martinez has also received several confirmation emails for medical appointments she did not make, each containing accurate personal information.

71.    Upon information and belief, after the Data Breach, Plaintiff's family members have received several phone calls from persons claiming to be Plaintiff.

72.    Plaintiff Martinez has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

73.    Plaintiff Martinez has suffered injury arising from the imminent substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened

by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

74.    Plaintiff Martinez has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### iii.  Plaintiff Johnson

75.    Plaintiff Johnson is a former Yuma Regional patient.

76.    In approximately 2019, as a condition of receiving medical services, Plaintiff Johnson provided her Private Information to Yuma with the expectation that her Private Information would remain confidential.

77.    Plaintiff Johnson entrusted that her Private Information would be safeguarded according to internal policies and state and federal law.

78.    Upon information and belief, Plaintiff Johnson's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

79.    On approximately June 9, 2022, Defendant notified Plaintiff Johnson that Defendant's network had been accessed by unauthorized third parties and that Plaintiff Johnson's Private Information may have been involved in the Data Breach.

80.    Plaintiff Johnson is very careful about sharing her sensitive Private Information. Plaintiff Johnson has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Johnson stores any documents containing her Private Information in a safe and secure location or destroys the documents.

81.    As a result of the Data Breach, Plaintiff Johnson has spent time dealing with

the consequences of the Data Breach, which include time spent verifying the legitimacy of the notice of the Data Breach, exploring credit monitoring and identity theft protection services, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

82.     Plaintiff Johnson suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Johnson entrusted to Defendant, which was compromised in and as a result of the Data Breach.

83.     Plaintiff Johnson also experienced actual injury in the form of fraud and identity theft. After the Data Breach, a creditor bill was noted as "unpaid" by the creditor, Charter Communications, even though it had been paid. The creditor sent Plaintiff Johnson's account to collections causing her credit score to decrease.

84.     Also, after the Data Breach, Plaintiff Johnson was notified by Experian—her credit monitoring services provider—that her personal information was detected on the "dark web."

85.     Following the Data Breach, Plaintiff immediately imposed a credit freeze on her credit accounts with the three major credit bureaus (i.e., Experian, Equifax, and TransUnion) to mitigate any further damage to her credit caused by the Data Breach.

86.     Plaintiff Johnson has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

87.     Since the Data Breach, Plaintiff Johnson has experienced an increase in spam e-mails, phone calls, and/or text messages.

88.     Upon information and belief, after the Data Breach, Plaintiff Jonson has

received phone calls from unknown callers asking Plaintiff about health insurance information matters.

89.    Plaintiff Johnson has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

90.    Plaintiff Johnson has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### iv.  Plaintiff Brian Kircher

91.    Plaintiff B. Kircher is a medical patient of Yuma Regional.

92.    In approximately 2008, as a condition of receiving medical services, Plaintiff B. Kircher provided his Private Information directly to Yuma with the expectation that his Private Information would remain confidential.

93.    Plaintiff B. Kircher entrusted that his Private Information would be safeguarded according to internal policies and state and federal law.

94.    Upon information and belief, Plaintiff B. Kircher's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

95.    On approximately June 9, 2022, Defendant notified Plaintiff B. Kircher that Defendant's network had been accessed by unauthorized third parties and that Plaintiff B. Kircher's Private Information may have been involved in the Data Breach.

96.    Plaintiff B. Kircher is very careful about sharing his sensitive Private

Information. Plaintiff B. Kircher has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff B. Kircher stores any documents containing his Private Information in a safe and secure location or destroys the documents.

97.    As a result of the Data Breach, Plaintiff B. Kircher has spent approximately six (6) hours of time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the Notice of Data Security Incident, exploring credit monitoring and identity theft protection services, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

98.    Plaintiff B. Kircher suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff Kircher entrusted to Defendant, which was compromised in and as a result of the Data Breach.

99.    Plaintiff B. Kircher has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

100.    Upon information and belief, Plaintiff B. Kircher has received an increased amount of suspicious phone calls, texts, and/or e-mails.

101.    Plaintiff B. Kircher has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff B. Kircher's Private Information.

102.    Plaintiff B. Kircher has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### v.  Plaintiff Sarabia

103.    Plaintiff Sarabia is a medical patient of Yuma Regional.

104.    In approximately 2021, as a condition of receiving medical services, Plaintiff Sarabia provided her Private Information directly to Yuma with the expectation that her Private Information would remain confidential.

105.    Plaintiff Sarabia entrusted that her Private Information would be safeguarded according to internal policies and state and federal law.

106.    Upon information and belief, Plaintiff Sarabia's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

107.    On approximately June 9, 2022, Defendant notified Plaintiff Sarabia that Defendant's network had been accessed by unauthorized third parties and that Plaintiff Sarabia's Private Information may have been involved in the Data Breach.

108.    Plaintiff Sarabia is very careful about sharing her sensitive Private Information. Plaintiff Sarabia has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Sarabia stores any documents containing her Private Information in a safe and secure location or destroys the documents.

109.    As a result of the Data Breach, Plaintiff Sarabia has spent approximately three (3) hours of time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the notice of the Data Breach, exploring credit

monitoring and identity theft protection services, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

110.    As part of Plaintiff Sarabia's efforts to mitigate the consequences of the Data Breach, Plaintiff is paying for credit monitoring services provided by Credit Karma.

111.    Plaintiff Sarabia suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Sarabia entrusted to Defendant, which was compromised in and as a result of the Data Breach.

112.    Plaintiff Sarabia also experienced actual injury in the form of fraud and/or identity theft. After the Data Breach, Plaintiff Sarabia was notified by her credit monitoring service, Credit Karma and her bank that her personal information was detected on the "dark web."

113.    Plaintiff Sarabia has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

114.    Plaintiff Sarabia has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

115.    Plaintiff Sarabia has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### vi.  Plaintiff Megan Kircher

116.    Plaintiff M. Kircher is a medical patient of Yuma Regional.

117.    In 2022, as a condition of receiving medical services, Plaintiff M. Kircher provided her Private Information directly to Yuma with the expectation that her Private Information would remain confidential.

118.    Plaintiff M. Kircher entrusted that her Private Information would be safeguarded according to internal policies and state and federal law.

119.    Upon information and belief, Plaintiff M. Kircher's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

120.    On approximately June 20, 2022, Defendant notified Plaintiff M. Kircher that Defendant's network had been accessed by unauthorized third parties and that Plaintiff M. Kircher's Private Information may have been involved in the Data Breach.

121.    Plaintiff M. Kircher is very careful about sharing her sensitive Private Information. Plaintiff Kircher has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff M. Kircher stores any documents containing her Private Information in a safe and secure location or destroys the documents.

122.    As a result of the Data Breach, Plaintiff M. Kircher has spent approximately ten (10) hours of time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the Notice of Data Security Incident, exploring credit monitoring and identity theft protection services, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

123.   Plaintiff M. Kircher suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff M. Kircher entrusted to Defendant, which was compromised in and as a result of the Data Breach.

124.   Plaintiff M. Kircher has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

125.   Plaintiff M. Kircher has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

126.   As a result of the Data Breach, Plaintiff M. Kircher's treatment provided by Defendant was delayed because Defendant was forced to shut down its information technology systems and use paper records to operate.

127.   Plaintiff Kircher has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### vii.  The Banti Plaintiffs

128.   The Banti Plaintiffs are medical patients of Yuma Regional.

129.   In approximately 2022, as a condition of receiving medical services, the Banti Plaintiffs provided their Private Information directly to Yuma Regional with the expectation that their Private Information would remain confidential.

130.   The Banti Plaintiffs entrusted that their Private Information would be

safeguarded according to internal policies and state and federal law.

131.    Upon information and belief, the Banti Plaintiffs' Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

132.    On approximately June 9, 2022, Defendant notified the Banti Plaintiffs that Defendant's network had been accessed by unauthorized third parties and that the Banti Plaintiffs' Private Information may have been involved in the Data Breach.

133.    The Banti Plaintiffs are very careful about sharing their sensitive Private Information. The Banti Plaintiffs have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. The Banti Plaintiffs store any documents containing their Private Information in a safe and secure location or destroy the documents.

134.    As a result of the Data Breach, the Banti Plaintiffs have spent time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the Notice of Data Security Incident, exploring credit monitoring and identity theft protection services, and self-monitoring their accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

135.    The Banti Plaintiffs suffered actual injury in the form of damages to and diminution in the value of their Private Information—a form of intangible property that the Banti Plaintiffs entrusted to Defendant, which was compromised in and as a result of the Data Breach.

136.    The Banti Plaintiffs also experienced actual injury in the form of identity theft. After the Data Breach, Plaintiff Donald Banti was contacted by Wells Fargo Bank alerting him of suspicious activity on his debit card caused by an unauthorized third person.

137.    The Banti Plaintiffs have suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have experienced anxiety and increased concerns for the loss of their privacy.

138.    After the Data Breach, the Banti Plaintiffs have received an increased amount of phone calls, text messages and/or emails from unknown callers. The Banti Plaintiff have received phone calls and text messages from unknown callers/senders inquiring about medical equipment, medical devices and/or other medically related matters.

139.    The Banti Plaintiffs have suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiffs' Private Information.

140.    The Banti Plaintiffs have a continuing interest in ensuring that their Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

**viii.   The Mangum Plaintiffs**

141.    The Mangum Plaintiffs are medical patients of Yuma Regional.

142.    In approximately 2022, as a condition of receiving medical services, the Mangum Plaintiffs provided their Private Information directly to Yuma Regional with the expectation that their Private Information would remain confidential.

143.    The Mangum Plaintiffs entrusted that their Private Information would be safeguarded according to internal policies and state and federal law.

144.    Upon information and belief, The Mangum Plaintiffs' Private Information was stored on Defendant's network during the Data Breach and presently remains in

Defendant's possession.

145.    On approximately June 9, 2022, Defendant notified the Mangum Plaintiffs that Defendant's network had been accessed by unauthorized third parties and that the Mangum Plaintiffs' Private Information may have been involved in the Data Breach.

146.    The Mangum Plaintiffs are very careful about sharing their sensitive Private Information. The Mangum Plaintiffs have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. The Mangum Plaintiffs store any documents containing their Private Information in a safe and secure location or destroy the documents.

147.    As a result of the Data Breach, the Mangum Plaintiffs have spent time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the Notice of Data Security Incident, exploring credit monitoring and identity theft protection services, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

148.    The Mangum Plaintiffs have suffered actual injury in the form of damages to and diminution in the value of their Private Information—a form of intangible property that the Mangum Plaintiffs entrusted to Defendant, which was compromised in and as a result of the Data Breach.

149.    The Mangum Plaintiffs also experienced actual injury in the form of identity theft and/or fraud. Upon information and belief, after the Data Breach, the Mangum Plaintiffs were informed by CreditWise and Experian that their personal information was on the "dark web."

150.    Upon information and belief, after the Data Breach, Plaintiff Tiffany Mangum received a bill for a February 2022 medical procedure for which she did not owe

money. Plaintiff Tiffany Mangum was forced to dispute that bill.

151.    The Mangum Plaintiffs have suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of their privacy.

152.    After the Data Breach, the Mangum Plaintiffs have received an increased amount of spam phone calls, text messages, and/or email messages from individuals unknown to Plaintiffs.

153.    Specifically, the Mangum Plaintiffs have received phone calls for relief of fake medical debt.

154.    The Mangum Plaintiffs have suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiffs' Private Information.

155.    The Mangum Plaintiffs have a continuing interest in ensuring that their Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### ix.  Plaintiff Spano.

156.    Plaintiff Spano has been a patient of Yuma Regional, and its affiliated healthcare providers, since approximately 2007.

157.    As a condition of receiving medical services, Plaintiff Spano provided his Private Information to Yuma with the expectation that his Private Information would remain confidential.

158.    Plaintiff Spano entrusted that his Private Information would be safeguarded

according to internal policies and state and federal law.

159.    Upon information and belief, Plaintiff Spano's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

160.    On approximately June 17, 2022, Defendant notified Plaintiff Spano that Defendant's network had been accessed by unauthorized third parties and that Plaintiff Spano's Private Information may have been involved in the Data Breach.

161.    Plaintiff Spano is very careful about sharing his sensitive Private Information. Plaintiff Spano has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Spano stores any documents containing his Private Information in a safe and secure location or destroys the documents.

162.    As a result of the Data Breach, Plaintiff Spano has spent over 100 hours of time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the Notice of Data Security Incident, exploring credit monitoring and identity theft protection services, dealing with fraud and identity theft, self-monitoring his accounts to ensure no fraudulent activity has occurred, closing accounts that had been subjected to fraud, and filing a police report regarding the identity theft and fraud he experienced. This time has been lost forever and cannot be recaptured.

163.    Plaintiff Spano suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff Spano entrusted to Defendant, which was compromised in and as a result of the Data Breach.

164.    Plaintiff Spano also suffered actual injury in the form of identity theft and/or

26

fraud. Upon information and belief, after the Data Breach, Plaintiff Spano detected unfamiliar and unauthorized transactions on two of his credit cards.

165. Plaintiff Spano also experienced actual injury in the form of identity theft on his bank account. The day after receiving notice from Defendant regarding the Data Breach, Plaintiff Spano received notification from Experian that someone was attempting to change the mailing address on his bank accounts to an address in Florida. Approximately a week later, someone attempted to make fraudulent charges on his Lowes credit card, which he had to ultimately close.

166. Plaintiff Spano has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

167. Upon information and belief, after the Data Breach, Plaintiff Spano experienced a sudden increase in spam phone calls, text messages, and/or emails.

168. After and because of the Data Breach, Plaintiff Spano froze his credit with the three major credit bureaus (i.e., Experian, TransUnion, Equifax).

169. Plaintiff Spano has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

170. Plaintiff Spano has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### x. Plaintiff Ashby

171.    As a condition of receiving medical services from Defendant, Plaintiff Ashby provided her Private Information to Yuma Regional with the expectation that her Private Information would remain confidential.

172.    Plaintiff Ashby entrusted that her Private Information would be safeguarded according to internal policies and state and federal law.

173.    Upon information and belief, Plaintiff Ashby's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

174.    On approximately June 9, 2022, Defendant notified Plaintiff Ashby that Defendant's network had been accessed by unauthorized third parties and that Plaintiff Ashby's Private Information may have been involved in the Data Breach.

175.    Plaintiff Ashby is very careful about sharing her sensitive Private Information. Plaintiff Ashby has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Ashby stores any documents containing her Private Information in a safe and secure location or destroys the documents.

176.    Since the Data Breach, Plaintiff Ashby has received suspicious phone calls for medical services, including attempts to sell her a CPAP machine, which her health care providers have not prescribed or recommended.

177.    As a result of the Data Breach, Plaintiff Ashby has spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach Letter, and self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

178.    Plaintiff Ashby suffered actual injury in the form of damages to and

diminution in the value of her Private Information—a form of intangible property that Plaintiff Ashby entrusted to Defendant, which was compromised in and as a result of the Data Breach.

179.    Plaintiff Ashby also experienced actual injury in the form of identity theft. Plaintiff Ashby was alerted by the IRS that someone tried to file a fraudulent tax return using her Private Information.

180.    Upon information and belief, Plaintiff Ashby spent significant time mitigating the consequences of the Data Breach, the time spent has included speaking with the IRS about the fraudulent tax return filed under Plaintiff's name and dealing with suspicious unknown callers offering Plaintiff medical equipment neither solicited by her nor prescribed to her by a medical professional.

181.    Plaintiff Ashby has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

182.    Plaintiff Ashby has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

183.    Plaintiff Ashby has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### xi.  Plaintiff O'Grady

184.    Plaintiff O'Grady is a medical patient of Yuma Regional.

185.    As a condition of receiving medical services, Plaintiff O'Grady provided her Private Information to Yuma with the expectation that her Private Information would remain confidential.

186.    Plaintiff O'Grady entrusted that her Private Information would be safeguarded according to internal policies and state and federal law.

187.    Upon information and belief, Plaintiff O'Grady's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

188.    Defendant notified Plaintiff O'Grady that Defendant's network had been accessed by unauthorized third parties and that Plaintiff O'Grady's Private Information, including her name, Social Security number, health insurance information, and other sensitive medical information, may have been involved in the Data Breach.

189.    Plaintiff O'Grady is very careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents.

190.    As a result of the Data Breach, Plaintiff O'Grady has spent time dealing with the consequences of the Data Breach, which include time spent verifying the legitimacy of the Notice of Data Security Incident, exploring credit monitoring and identity theft protection services, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

191.    Plaintiff O'Grady suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data

Breach.

192.    Plaintiff O'Grady has suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

193.    Plaintiff O'Grady has suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

194.    Plaintiff O'Grady has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### xii.   Plaintiff Esquivel and her minor son, E.N.

195.    Plaintiff Esquivel and her minor son are medical patients of Yuma.

196.    As a condition of receiving medical services, Plaintiff Esquivel provided both her and her son's Private Information directly to Yuma with the expectation that their Private Information would remain confidential.

197.    Plaintiff Esquivel entrusted that their Private Information would be safeguarded according to internal policies and state and federal law.

198.    Upon information and belief, Plaintiff Esquivel and her minor son's Private Information was stored on Defendant's network during the Data Breach and presently remains in Defendant's possession.

199.    Defendant notified Plaintiff Esquivel that Defendant's network had been accessed by unauthorized third parties and that Plaintiff's Private Information may have

been involved in the Data Breach.

200.    Plaintiff Esquivel is very careful about sharing sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her or her son's Private Information in a safe and secure location or destroys the documents.

201.    Plaintiff Esquivel and her minor son suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

202.    Plaintiff Esquivel also experienced actual injury in the form of fraud and/or identity theft as a result of the Data Breach.

203.    Upon information and belief, as a result of the Data Breach, an unknown individual attempted to log into and use Plaintiff Esquivel's account for a Free Application for Federal Student Aid ("FAFSA").

204.    Plaintiff Esquivel and her son have suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of their privacy.

205.    Upon information and belief, as a result of the Data Breach, Plaintiff Esquivel has been receiving spam phone calls, text messages, and/or emails.

206.    Upon information and belief, Plaintiffs Esquivel has spent a total of about ten (10) hours dealing with the consequences of the Data Breach, including but not limited to researching the events relating to and the effects of the Data Breach, investigating ways to mitigate damage done to her from Defendant's unauthorized disclosure of her Private Information, and precluding the attempted unauthorized use of Plaintiff Esquivel's FAFSA

account.

207.    Plaintiff Esquivel and her son have suffered injury arising from the imminent and substantial risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals. This injury was worsened by Defendant's delay in revealing the true nature of the threat to Plaintiff's Private Information.

208.    Plaintiff Esquivel and her son have a continuing interest in ensuring that their Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from future breaches.

### C.    Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft

209.    Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PHI that can be directly traced to Defendant.

210.    The ramifications of Defendant's failure to keep Plaintiffs' and the Class's PHI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

211.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.[2]

212.    As a result of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer

---

[2] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, ThreatPost.com (Feb. 21, 2013), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/ (last visited Feb. 12, 2024).

damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

     a. The loss of the opportunity to control how their PHI is used;

     b. The diminution in value of their PHI;

     c. The compromise and continuing publication of their PHI;

     d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

     e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

     f. Delay in receipt of tax refund monies;

     g. Unauthorized use of stolen PHI; and

     h. The continued risk to their PHI, which remains in the possession of Yuma Regional and is subject to further breaches so long as Yuma Regional fails to undertake the appropriate measures to protect the PHI in their possession.

213. Stolen PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PHI can be worth up to $1,000.00 depending on the type of information obtained.[3]

214. The value of Plaintiffs' and the proposed Class's PHI on the black market is considerable. Stolen PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

---

[3] *See Here's How Much Your Personal Information is Selling for on the Dark Web*, Experian, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Feb. 12, 2024).

215. It can take victims years to spot identity or PHI theft, giving criminals plenty of time to milk that information for cash.

216. One such example of criminals using PHI for profit is the development of "Fullz" packages.[4]

217. Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

218. The development of "Fullz" packages means that stolen PHI from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other members of the

---

[4] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY, (Sep. 18, 2014), *available at* https://krebsonsecurity.com/tag/fullz/ (last visited Feb. 12, 2024).

proposed Class's stolen PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

219.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

220.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiffs and the Class that their PHI had been stolen.

221.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

222.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

223.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PHI. To protect themselves, Plaintiffs and the Class will need to be remain vigilant against unauthorized data use for years or even decades to come.

224.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to

comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[5]

225.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[6] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[7]

226.    According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[8] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

227.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of*

---

[5] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Feb. 12, 2024).

[6] *Start With Security, A Guide for Business*, FTC, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Feb. 12, 2024).

[7] *Id.*

[8] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited Feb. 12, 2024).

*Lookout Services, Inc.*, No. C-4326, ℙ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ℙ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Yuma Regional thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PHI.

228.    The healthcare industry is a prime target for data breaches.

229.    Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40%

increase from 2015.[9] The next year, that number increased by nearly 45%.[10] The following year the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[11]

230. Data breaches within the healthcare industry continued to increase rapidly. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 68% of participating vendors reported having a significant security incident within the last 12 months, with a majority of those being caused by "bad actors."[12]

231. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[13] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[14] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at

---

[9] *Data Breaches Increase 40 Percent in 2016, Finds New Report from Identity Theft Resource Center and CyberScout*, Identity Theft Resource Ctr. ("ITRC") (Jan. 19, 2017), https://bit.ly/30Gew91 [hereinafter "*Data Breaches Increase 40 Percent in 2016*"] (last visited Feb. 12, 2024).

[10] *Data Breaches Up Nearly 45 Percent According to Annual Review by Identity Theft Resource Center® and CyberScout®*, ITRC (Jan. 22, 2018), https://bit.ly/3jdGcYR [hereinafter "*Data Breaches Up Nearly 45 Percent*"] (last visited Feb. 12, 2024).

[11] *2018 End-of-Year Data Breach Report*, ITRC (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf. (last visited Feb. 12, 2024).

[12] *2019 HIMSS Cybersecurity Survey*, Healthcare Info. & Mgmt. Sys. Soc'y, Inc. (Feb. 8, 2019), https://bit.ly/3LJqUr6 (last visited Feb. 12, 2024).

[13] *2018 End-of-Year Data Breach Report*, *supra* n.14.

[14] Elinor Mills, *Study: Medical Identity Theft Is Costly for Victims*, CNET (Mar. 3, 2010), https://cnet.co/33uiV0v (last visited Feb. 12, 2024).

1    all. Data breaches and identity theft have a crippling effect on individuals and detrimentally

2    impact the economy as a whole.[15]

3    232.    The healthcare industry has "emerged as a primary target because [it sits] on

4    a gold mine of sensitive personally identifiable information for thousands of patients at any

5    given time. From social security and insurance policies to next of kin and credit cards, no

6    other organization, including credit bureaus, ha[s] so much monetizable information stored

7    in their data centers."[16]

8    233.    Charged with handling highly sensitive Personal Information including

9    healthcare information, financial information, and insurance information, Defendant knew

10   or should have known the importance of safeguarding the Personal Information that was

11   entrusted to it. Defendant also knew or should have known of the foreseeable consequences

12   if its data security systems were breached. This includes the significant costs that would be

13   imposed on Defendant's patients as a result of a breach. Defendant nevertheless failed to

     take adequate cybersecurity measures to prevent the Data Breach from occurring.

14   234.    Defendant disclosed the PHI of Plaintiffs and members of the proposed Class

15   for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up,

16   disclosed, and exposed the PHI of Plaintiffs and members of the proposed Class to people

17   engaged in disruptive and unlawful business practices and tactics, including online account

18   hacking, unauthorized use of financial accounts, and fraudulent attempts to open

19   unauthorized financial accounts (i.e., identity fraud), all using the stolen PHI.

20   235.    Defendant's use of outdated and insecure computer systems and software

21   that are easy to hack, and its failure to maintain adequate security measures and an up-to-

22   date technology security strategy, demonstrates a willful and conscious disregard for

23   ---

     [15] *Id.*

24   [16] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Inside
     Digital Health (Apr. 4, 2019), https://bit.ly/3x6fz08 (last visited Feb. 12, 2024).

25

privacy, and has exposed the PHI of Plaintiffs and potentially thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

236.    Defendant's failure to properly notify Plaintiffs and members of the proposed Class of the Data Breach exacerbated Plaintiffs' and members of the proposed Class's injury by depriving them of the earliest ability to take appropriate measures to protect their PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

### D.  Yuma Regional Failed to Adhere to HIPAA

237.    HIPAA prescribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[17]

238.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI are properly maintained.[18]

239.    The Data Breach itself resulted from a combination of inadequacies showing Yuma Regional failed to comply with safeguards mandated by HIPAA. Yuma Regional's security failures include, but are not limited to:

---

[17] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[18] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

a. Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by Yuma Regional's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

**E. Yuma Regional Failed to Adhere to FTC Guidelines**

240.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[19] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Yuma Regional, should employ to protect against the unlawful exposure of Personal Information.

241.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[20] The guidelines explain that businesses should:

    a.  protect the personal customer information that they keep;

    b.  properly dispose of personal information that is no longer needed;

    c.  encrypt information stored on computer networks;

    d.  understand their network's vulnerabilities; and

    e.  implement policies to correct security problems.

242.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

243.    The FTC recommends that companies not maintain PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

244.    The FTC has brought enforcement actions against businesses for failing to

---

[19] *Start with Security: A Guide for Business*, Fed. Trade Comm'n (June 2015), *supra,* Note 9.

[20] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://bit.ly/3u9mzre (last visited Feb. 12, 2024).

[21] *See Start with Security*, *supra* n.22.

adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

245.    Yuma Regional's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## **CLASS ACTION ALLEGATIONS**

246.    Plaintiffs brings this action on behalf of themselves, and all members of the proposed Class (the "Class") pursuant to Ariz. R. Civ. P. 23(b)(2) and (b)(3) as defined as:

> All Yuma Regional Medical Center patients whose PHI was accessed in the Data Breach.

247.    The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

248.    The Class defined above is identifiable through Defendant's business records.

249.   Plaintiffs reserve the right to amend the class definition.

250.   This action is properly maintainable as a class action under Ariz. R. Civ. P. 23.

251.   **Numerosity**. Plaintiffs are representative of the proposed Class, consisting of hundreds of thousands of members, far too many to join in a single action.

252.   **Commonality**. There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

    a.   Whether Defendant had a duty to use reasonable care to safeguard Plaintiffs' and members of the Class's PHI;

    b.   Whether Defendant breached the duty to use reasonable care to safeguard members of the Class's PHI;

    c.   Whether Defendant breached its contractual promises to safeguard Plaintiffs' and members of the Class's PHI;

    d.   Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing sensitive PHI;

    e.   Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiffs' and members of the Class's PHI from unauthorized release and disclosure;

    f.   Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiffs' and members of the Class's PHI from unauthorized release and disclosure;

    g.   Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

h. Whether Defendant's delay in informing Plaintiffs and members of the Class of the Data Breach was unreasonable;

i. Whether Defendant's method of informing Plaintiffs and other members of the Class of the Data Breach was unreasonable;

j. Whether Defendant's conduct was likely to deceive the public;

k. Whether Defendant is liable for negligence or gross negligence;

l. Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the PHI violated applicable state laws;

m. Whether Plaintiffs and members of the Class were injured as a proximate cause or result of the Data Breach;

n. Whether Plaintiffs and members of the Class were damaged as a proximate cause or result of Defendant's breach of its contract with Plaintiffs and members of the Class;

o. Whether Defendant's practices and representations related to the Data Breach breached implied warranties;

p. What the proper measure of damages is; and

q. Whether Plaintiffs and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

253. **Typicality**. Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs, and the members of the Class sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiffs and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

254. **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class.

Plaintiffs have no interests that conflict with, or are antagonistic to those of, the Class, and Defendant has no defenses unique to Plaintiffs.

255. **Superiority of Class Action**. A class action is also a fair and efficient method of adjudicating the controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Consolidated Class Action Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

256. A class action is therefore superior to individual litigation because:

a. The amount of damages available to an individual Plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

b. Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c. The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

257.    The litigation of the claims brought herein is manageable. Yuma Regional's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

258.    Adequate notice can be given to Class members directly using information maintained in Yuma Regional's records.

259.    **Predominance**. Pursuant to Rule 23(b)(3), the issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include but are not limited to the questions identified above.

260.    This proposed class action does not present any unique management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

261.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-260 as if fully alleged at length herein.

262.    Plaintiffs and members of the Class entrusted their PHI to Defendant. Defendant owed to Plaintiffs and other members of the Class a duty to exercise reasonable care in handling and using the PHI in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

263.    Defendant owed a duty of care to Plaintiffs and members of the Class because it was foreseeable that Defendant's failure to adequately safeguard their PHI in accordance with state-of-the-art industry standards concerning data security would result in the

compromise of that PHI—just like the Data Breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and members of the Class's PHI by disclosing and providing access to this information to third parties and by failing to properly supervise both the manner in which the PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

264.    Defendant owed Plaintiffs and members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their PHI. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary in order for Plaintiffs and members of the Class to take appropriate measures to protect their PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

265.    Defendant owed these duties to Plaintiffs and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiffs' and members of the Class's personal information and PHI for medical treatment services. Plaintiffs and members of the Class were required to provide their personal information and PHI to Defendant in order to receive medical treatment and services, and Defendant retained that information.

266.    The risk that unauthorized persons would attempt to gain access to the PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PHI.

267.    PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PHI of Plaintiffs and members of the Class and the importance of exercising reasonable care in handling it.

268.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PHI of Plaintiffs and members of the Class which actually and proximately caused the Data Breach and Plaintiffs' and members of the Class's injury. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and members of the Class's injuries-in-fact. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and members of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

269.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and members of the Class's actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PHI by criminals, improper disclosure of their PHI, lost benefit of their bargain, lost value of their PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence Per Se**
**(On Behalf of Plaintiffs and the Class)**

270.    Plaintiffs re-allege and incorporate by reference the allegations contained in

50

paragraphs 1-260 as if fully alleged at length herein.

271.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and members of the Class's PHI.

272.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, patients' PHI. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the members of the Class's sensitive PII.

273.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and the Class's PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to its patients in the event of a breach, which ultimately came to pass.

274.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

275.    Defendant had a duty to Plaintiffs and the members of the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and the Class's PII.

276.    Defendant breached its respective duties to Plaintiffs and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and members of the Class's PII.

277.    Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence per se.

278.    Pursuant to HIPAA (42 U.S.C. § 1302d, *et seq*.), Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class members' PHI.

279.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304 definition of encryption).

280.    Plaintiffs and Class members are within the class of persons that the HIPAA was intended to protect.

281.    The harm that occurred as a result of the Data Breach is the type of harm that HIPAA was intended to guard against. The Federal Health and Human Services' Office for Civil Rights ("OCR") has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures relating to protected health information, caused the same harm as that suffered by Plaintiffs and the Class members.

282.    Defendant breached its duties to Plaintiffs and the Class under HIPAA, by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PHI.

283.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

284. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

285. The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PHI.

286. Had Plaintiffs and members of the Class known that Defendant did not adequately protect their PHI, Plaintiffs and members of the Class would not have entrusted Defendant with their PHI.

287. As a direct and proximate result of Defendant's negligence per se, Plaintiffs and members of the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; unreimbursed losses relating to fraudulent charges; losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**Breach of an Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

288. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-260 as if fully alleged at length herein.

289. Defendant offered to provide goods and services to Plaintiffs and members of the Class in exchange for payment.

290.    Defendant also required Plaintiffs and the members of the Class to provide Defendant with their PHI in order to receive goods and services.

291.    In turn, and through the Privacy Policy, Defendant agreed it would not disclose the PHI it collects from patients to unauthorized persons. Defendant also promised to maintain safeguards to protect its patients' PHI.

292.    Plaintiffs and the members of the Class accepted Defendant's offer by providing PHI to Defendant in exchange for receiving Defendant's goods and services and then by paying for and receiving the same.

293.    Implicit in the parties' agreement was that Defendant would provide Plaintiffs and members of the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PHI.

294.    Plaintiffs and the members of the Class would not have entrusted their PHI to Defendant in the absence of such agreement with Defendant.

295.    Defendant materially breached the contract(s) it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its systems that compromised such information. Defendant further breached the implied contracts with Plaintiffs and members of the Class by:

    a.  Failing to properly safeguard and protect Plaintiffs' and members of the Class's PHI;

    b.  Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

    c.  Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

296.   The damages sustained by Plaintiffs and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

297.   Plaintiffs and members of the Class have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendant.

298.   The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

299.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

300.   Defendant had an implied duty to reasonably safeguard and protect the PHI of Plaintiffs and Class members from unauthorized disclosure or uses.

301.   Additionally, Defendant implicitly promised to retain this PHI only under conditions that kept such information secure and confidential.

302.   Plaintiffs and Class members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiffs and Class members would not have provided their confidential PHI to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PHI for uses other than medical treatment, billing, and benefits from Defendant.

303.   Defendant failed to advise Plaintiffs and members of the Class of the Data Breach promptly and sufficiently.

304. In these and other ways, Defendant violated its duty of good faith and fair dealing.

305. Plaintiffs and members of the Class have sustained damages as a result of Defendant's breaches of its agreement, including breaches thereof through violations of the covenant of good faith and fair dealing.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

306. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-260 as if fully alleged at length herein.

307. This claim is pleaded in the alternative to the breach of implied contractual duty claim.

308. Plaintiffs and members of the Class conferred a monetary benefit upon Defendant in the form of monies paid for treatment services.

309. Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiffs and members of the Class. Defendant also benefited from the receipt of Plaintiffs' and members of the Class's PHI, as this was used to facilitate payment and treatment services.

310. As a result of Defendant's conduct, Plaintiffs and members of the Class suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and members of the Class paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

311. Under principals of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and members of the Class because Defendant failed to implement (or adequately implement) the data privacy and security

practices and procedures for itself that Plaintiffs and members of the Class paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

312.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**FIFTH CAUSE OF ACTION**
**Arizona Consumer Fraud Act,**
**A.R.S. §§ 44-1521, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

313.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-260 as if fully alleged at length herein.

314.    Defendant sold Plaintiffs and Class members "merchandise" as that term is defined by A.R.S. § 44-1521, in the form of services, including healthcare and insurance services, as well as the sale of objects, wares, goods, and commodities at outlets where Defendant accepted payment cards in point-of-sale transactions.

315.    Section 44-1522 of the Arizona Consumer Fraud Act provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

*See* A.R.S. § 44-1522(A).

316.    Defendant used deception, used a deceptive act or practice, and fraudulently omitted and concealed material facts in connection with the sale or advertisement of that merchandise in violation of A.R.S. § 44-1522(A).

317.    Defendant omitted and concealed material facts, which it knew about and had the duty to disclose—namely, Defendant's inadequate privacy and security protections

for Plaintiffs' and Class members' PHI. Defendant omitted and concealed those material facts even though in equity and good conscience those facts should have been disclosed and did so with the intent that others would rely on the omission, suppression, and concealment.

318.    The concealed facts are material in that they are logically related to the transactions at issue and rationally significant to the parties in view of the nature and circumstances of those transactions.

319.    Plaintiffs do not allege any claims based on any affirmative misrepresentations by Defendant; rather, Plaintiffs allege that Defendant omitted, failed to disclose, and concealed material facts and information as alleged herein, despite its duty to do so.

320.    Defendant knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class members' PHI, and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in these deceptive acts and practices were negligent, knowing and willful, and wanton and reckless with respect to the rights of Plaintiffs and Class members.

321.    Specifically, Defendant failed to comply with the standards outlined by the FTC and HIPAA regarding protecting PHI. As a healthcare institution that has operated since 1964, Defendant was or should have been aware of these standards. Defendant's data security systems did not follow the FTC's guidelines and HIPAA's Administrative Simplification Rules and, as a result, were operating below the minimum standards set forth.

322.    Plaintiffs and Class members were ignorant of the truth and relied on the concealed facts and incurred damages as a consequent and proximate result.

323.    Plaintiffs and Class members seek all available relief under A.R.S. §§ 4421, *et seq.*, including, but not limited to, compensatory damages, punitive damages, injunctive relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, request the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiffs as Class representatives and the undersigned as Class counsel;

B.    A mandatory injunction directing Yuma Regional to adequately safeguard the PHI of Plaintiffs and the Class hereinafter by implementing improved security procedures and measures;

C.    A mandatory injunction requiring that Yuma Regional provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PHI to unauthorized persons;

D.    Enjoining Yuma Regional from further deceptive practices and making untrue statements about the Data Breach and the stolen PHI;

E.    An award of damages, in an amount to be determined;

F.    An award of attorneys' fees and costs;

G.    An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.    Granting the Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.    Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury on all issues so triable.

Dated:  April 11, 2024                    Respectfully submitted,

1

2       _s/ Jean S. Martin_
        Jean S. Martin (admitted *pro hac vice*)
3       **MORGAN & MORGAN**
        **COMPLEX LITIGATION GROUP**
4       201 N. Franklin Street, 7th Floor
        Tampa, Florida 33602
5       Telephone: (813) 223-5505
        Facsimile: (813) 223-5402
6       *jeanmartin@forthepeople.com*

7
        Bryan L. Bleichner (admitted *pro hac vice*)
8       **CHESTNUT CAMBRONNE PA**
        100 Washington Avenue South, Suite 1700
9       Minneapolis, MN 55401
        Phone: (612) 339-7300
10      Fax: (612) 336-2940
        *bbleichner@chestnutcambronne.com*
11

12      *Interim Co-Lead Class Counsel for Plaintiffs
        and the Proposed Class*
13

14

15

16

17              **CERTIFICATE OF SERVICE**

18
             I hereby certify that on April 11, 2024, a copy of foregoing was filed
19
        electronically. Notice of this filing will be sent by operation of the Court's electronic
20
        filing system to all parties indicated on the electronic filing receipt. Parties may access
21
        this filing through the Court's system.
22
                                 _s/ Jean S. Martin_
23                               Jean S. Martin

24

25